1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACKIE ROSE YOUNG,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Case No. 1:13-CV-00937-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER<br><br>(Doc. 1) |

Plaintiff Jackie Rose Young, by her attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits pursuant to Title II and for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) ("the Act").  This action was initially referred to the undersigned pursuant to Local Rule 302(c)(15), and both parties voluntarily consented to proceed before a United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c).  The matter is before the Court on the parties' cross-briefs, which were submitted without oral argument to the Honorable Sandra M. Snyder, U.S. Magistrate Judge.  Following a review of the complete record and applicable law, the Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence.

1

**BACKGROUND**

**I.  Procedural History**

On June 2, 2010, Plaintiff applied for disability insurance benefits and supplemental security income.  Plaintiff alleges onset of disability on April 30, 2002.   The Commissioner initially denied the claims on October 26, 2010, and upon reconsideration again denied the claims on January 25, 2011.  On February 4, 2011, Plaintiff filed a timely request for a hearing.

On July 13, 2012, and represented by counsel, Plaintiff appeared and testified at a video hearing presided over by Patricia Leary Flierl, Administrative Law Judge ("the ALJ").  *See* 20 C.F.R. 404.929 *et seq.*  An impartial vocational expert, Jose L. Chaparro, also appeared and testified.

On August 17, 2012, the ALJ denied Plaintiff's application.  The Appeals Council denied review on March 2, 2013.  The ALJ's decision thus became the Commissioner's final decision.  *See* 42 U.S.C. § 405(h).  On June 19, 2013, Plaintiff filed a complaint seeking this Court's review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

**II.  Administrative Record**[1]

A.  Plaintiff's Testimony (July 13, 2012)

Plaintiff, born March 11, 1976, lived with her husband and three children (ages 12, 15, and 17 years at the time of the hearing).  Plaintiff completed high school, received her certified nurse assistant ("CNA") certificate, and was able to communicate in English.  Plaintiff testified that she last worked for a short period in 2002 at a fast food restaurant.  Plaintiff testified that she was not currently working and had not worked since 2002.

Plaintiff testified that in 1999 her duties as a CNA included taking vitals, charting vitals, assisting patients, and lifting them "from the bed to the wheelchair or from the wheelchair to the bed."  She reported that the patients could be as much as 250-300 pounds and she would lift them

---

[1] Plaintiff does not contest the ALJ's findings regarding her physical functional capacity or the weighing of her credibility.  Therefore, the Court summarizes only the disputed medical evidence relevant to Plaintiff's mental condition, as well as the vocational evidence.

either with their assistance or by herself using a belt lift.  She testified that her CNA work was a full-time job.  As a fast-food worker in 2002, Plaintiff testified that she worked as a part-time cashier.

Plaintiff alleged onset of disability in 2002 due to slipped discs, scoliosis, herniated discs, ADHD, arthritis, degenerative discs, constant neck pain and back pain which causes migraine headaches.  Plaintiff testified that she stopped working because "I'm in, it's just too much pain, too much pain to be on my feet or, for a certain amount of time or sit down for a certain amount of time."  She testified that she experienced pain "all the time" in her upper back, neck, head, legs, and hips, as well as experienced problems due to her ADHD, asthma and anxiety.  She reported that she ranked the pain without medication as an eight out of ten, but with medication only a four or five.

To manage her pain, Plaintiff testified that she took the fibromyalgia medication Gabapentin, over-the-counter medications such as Tylenol, Ibuprofen, and Naproxen, as well as Advair for her asthma.  Plaintiff testified that she had received physical therapy treatment which eased her pain and that it "made it easier for me to go through, through a few days without really being in pain and getting migraines."  She also reported having received pain shots in her back, though the treatment had not taken her pain away completely.  Plaintiff testified that she was not currently receiving any mental health treatment.

Plaintiff described that in a typical day she spends six to eight hours lying down to ease her back pain.  She reported that her physical therapist had advised resting with her feet elevated.  Describing her daily activities, Plaintiff testified that she cooks every day and makes dinner "and stuff" for her children.  Due to her pain, Plaintiff reported doing housework for a maximum 20 minutes before resting for 10-15 minutes.  She testified that her husband and children do the heavier housework.  Plaintiff maintained her driver's license and still drove alone, though avoided driving at night or for long distances.  Plaintiff did not allege any mental impairments.

Plaintiff testified that the most weight that she could lift comfortably was eight pounds.  She testified that it took her "a good four hours" to "do" her house because she stopped to take 10-15

3

minute breaks approximately every 20 minutes.  Plaintiff stated that she could bend, and walk on uneven surfaces or unassisted up stairs, but not without corresponding pain; could touch her chin to her chest, but with pain; could squat if aided to stand; could kneel; could not crouch; likely could not climb a ladder; and could not move her head such that her chin would touch her shoulder.  She testified that she could sit for approximately 20 minutes before she would need to stand up or reposition her body.  She stated that she could stand still for "not even five minutes" due to pain.  She further testified that she could walk "maybe five minutes without having to rest."  Plaintiff reported no problems with personal care, bathing, or dressing herself.  At the hearing, Plaintiff's attorney had the following exchange with Plaintiff about her typical daily activities:

Q      And when you say you're at least able to function, what do you mean by that?

A      I can do my housework, I should do with my kids, hang out with my kids, I, you know, what I'm supposed to do.

Q      Okay, and when you say do your housework, what kinds of things do you do?

A      I vacuum . . . I do the laundry, I cook, I do the kitchen.

Plaintiff testified that she had been in a serious car accident some years prior where her car had flipped and was "totaled."  Plaintiff hypothesized that her anxiety issues stemmed from her car accident.  She reported having "a small panic attack" if she sees "a car moving looking like it's not going to do the right thing."  Other conditions had also prompted episodes, such as "sometimes at home when, when I worry about my kids," where she defined "sometimes" as "maybe once or twice a month."  She stated that her anxiety episodes lasted "maybe 20 minutes," but that after that she was "fine."  Plaintiff testified that she experienced difficulty concentrating and paying attention.  She reported being able to pay attention for "maybe 15 minutes at a time," after which she would "get distracted  . . . looking around the room."  She considered that she could concentrate for approximately 20 minutes at maximum, after which she needed a break of "about 15 minutes."

//

4

B.  Adult Function Report

In an Adult Function Report dated August 2, 2010, Plaintiff wrote the following to describe her daily activities:

> I wake up, stretch, so that I will [not] be so stiff, feed and take care of my children.  I have to give them their meds.  Make food for myself and husband.  Then if it is a school day I will send my children to school or drive them myself.  Then I lay down to rest a bit.  Then I begin my day with house cleaning and shop[p]ing.  When that is done I will lay down and rest because my back is hurting so I must rest for about one hour.  By then it would be time for my two older children to be home.  I will help them with homework and then [it] will be time to get my youngest – 6:00 – then come home, make dinner, clean kitchen and get kids ready for school the next day and ready for bed.  Finally I get to rest and sleep.

Plaintiff further reported that she continued to shop in stores for food, clothing, and household items, and did so two to three times per month.  She wrote that she was able to pay bills, handle a savings account, count change, and use her checkbook.  In the same report, she wrote that her hobbies and interests were reading, watching television, playing with her children, and hanging out with her husband.  As to her functional abilities, Plaintiff wrote that she could walk 1 ½ miles before needing to rest.  When asked to describe how long she could pay attention, Plaintiff wrote "all the time."  She affirmed that she could finish what she started, including conversations, chores, reading, and watching movies.

Plaintiff wrote that she spent time doing social activities such as visiting friends and family.  She reported going to church regularly.  She reported that she did not need someone to accompany her at these social activities.  When prompted to answer whether she had problems getting along with family, friends, neighbors, or others, Plaintiff replied "No."  When asked how well she got along with authority figures, Plaintiff wrote, "very well."  She also wrote that she had never been fired or laid off from a job because of problems getting along with other people.  Plaintiff noted that she did not handle stress well.

//

//

C.  Third-Party Function Report

In a third-party adult function report dated August 2, 2010, Plaintiff's husband, Tim Young, wrote that on a typical day, Plaintiff "tries to keep house and raise kids."  He reported that Plaintiff took care of him, the children, as well as a dog and cat.  Mr. Young reported that both he and the children assisted by doing the "heavy lifting," and walking, playing with, and feeding the animals. Mr. Young reported that Plaintiff had no problems with personal care, though needed reminders to take medicine.  Mr. Young described that Plaintiff prepared meals at least once per day and that it took her approximately 30 minutes to do so.  Plaintiff did household chores for two hours "every other day," and some laundry.  Mr. Young wrote that Plaintiff shopped twice per month for food and household goods and could go out alone.  Plaintiff could pay bills, count change, handle a savings account, and use a checkbook.

To describe Plaintiff's social activities and things she does with others, her husband wrote, "phone, church . . . every day."  He wrote that she went to church, movies, and dinner on a regular basis.  When asked whether his wife had problems getting along with family, friends, neighbors, or others, Mr. Young responded, "No."  The only changes he described in her social activities since her condition began were "less road trips, more down time."  Mr. Young wrote that his wife got along with authority figures "good," and had never been fired or laid off from a job because of problems getting along with other people.

Mr. Young reported that his wife could pay attention "90%" of the time, that she finished what she started, and could follow verbal and written instructions "good."  Plaintiff's husband wrote that though Plaintiff "sometimes" did not handle stress well, she was generally "good" when faced with stress.  Mr. Young wrote that he had not noticed any unusual behavior or fears in his wife.  In his summary, Mr. Young wrote, "I know Jackie has back pain day and night, some days are bad and some are good . . . but always a little pain . . . drugs and heating pads help plus physical therapy."

//

D.  Mental Health Evidence

The ALJ properly considered the following medical records and opinions.

At the request of the state agency, consultative clinical psychologist, neuropsychologist, and board certified medical psychologist, Roger A. Izzi, M.D., examined the Plaintiff on October 2, 2010.  Dr. Izzi evaluated Plaintiff in a complete psychological evaluation with psychological testing. Plaintiff reported to Dr. Izzi that her chief complaints were "pain in back . . . I like to keep myself busy, ADD."  Plaintiff denied a history of head injury.  Plaintiff reported that she had experienced prior abuse at the hands of her youngest daughter's father when still living in Nebraska.  She also reported a work injury sustained during her time as a CNA.  Dr. Izzi summarized Plaintiff's reported daily activities as follows:

> She gets up around 6:45 a.m.  She gets the children to school and then will go back to bed until 9:30 p.m.  She can do her own laundry and food preparation.  She does not belong to any clubs, groups, or organizations.  She attends religious services on a regular basis.  She occasionally sees family.  She sees friends on a regular basis.  She goes to bed around 10:00 p.m.  The claimant noted occasional problems with eating habits and appetite.  She noted occasional sleeping difficulties because of "allergies."  She noted occasional unprovoked crying spells.

Dr. Izzi noted that Plaintiff reported no history of alcohol abuse, although she had a period of drug abuse, specifically crack cocaine and methamphetamine, beginning at age 24 and continuing until seven years ago.  Dr. Izzi wrote that Plaintiff had no history of psychiatric hospitalization and that Plaintiff was not then consulting any mental health professionals.  At the time of the consultation, Dr. Izzi noted that Plaintiff was taking tramadol, medical marijuana, and ibuprofen. Dr. Izzi observed that Plaintiff appeared appropriately dressed and groomed; she wore eyeglasses and earrings, was five feet, six inches tall and of average build, and had normal speech.  She presented a current California driver's license.  About her behavior, Dr. Izzi wrote that she arrived on time for the evaluation, but that her mood was tense and "she seemed fidgety."  When asked how she was feeling emotionally, she responded, "pretty happy."

7

Dr. Izzi opined that Plaintiff had no gross indications of psychosis or schizophrenia.  She had no apparent loss of contact with reality.  At the consultation, Dr. Izzi administered the Wechsler Adult Intelligence Scale-III (WAIS-III) and the Wechsler Memory Scale-IV (WMS-IV).  At 81, Plaintiff's verbal IQ was in the low-average range (between 80-90); her performance IQ was 78, in the borderline range (70-79); and her full scale IQ measured 78.[2]  According to Dr. Izzi, the test results suggested that Plaintiff's then-present level of intellectual functioning was within the Borderline to Low Average Range, based on the test scoring criteria.  The WMS-IV assessed Plaintiff's memory functions, where her auditory memory index was 72, her visual memory index was 59, and her immediate memory index was 73.[3]   Overall, Dr. Izzi concluded that test results suggested deficits in Plaintiff's short-term auditory memory and short-term visual memory.

Dr. Izzi diagnosed Anxiety Disorder, not otherwise specified (NOS), Attention-Deficit Hyperactivity Disorder (NOS), and Post-Traumatic Stress Disorder (NOS).  He reported having reviewed Plaintiff's available medical records.  In his functional assessment, Dr. Izzi wrote:

> Clinical interview indicates that the claimant is not having any difficulty caring for basic hygiene.  The present evaluation suggests that on a purely psychological basis, the claimant does appear capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period.  Her ability to get along with peers or be supervised in work-like setting would be moderately limited by her mood disorder.  The deficits in short term memory, as suggested by the results of  Wechsler memory Scale IV, would limit the claimant's ability to perform a complex task on a consistent basis over an eight-hour period.  On a purely psychological basis, the claimant appears capable of responding to usual work session situations regarding attendance and safety issues.  On a purely psychological basis, the claimant appears capable of dealing with changes in a routine work setting.

He further noted that Plaintiff appeared to be capable of managing her own funds.

In September 2010, consultative psychiatrist D. Subin, M.D., examined Plaintiff at the request of the state agency.  At the consultation, Dr. Subin noted that Plaintiff's affect was tense, she was "very jittery," and appeared very thin.  Dr. Subin wrote that Plaintiff was appropriately groomed

---

[2] The mean of the WAIS-III is 100, with a standard deviation of 15.  Two thirds of adults have IQ scores between 85-110 according to the Wechsler Adult Intelligence Scale-III.
[3] The mean of the WMS-IV index scores is 100, with a standard deviation of 15, according to the Wechsler Memory Scale-IV.

and dressed.  He observed that she had a visible rash on her chest and collarbone, "about the size of a baseball."  Dr. Subin noted that Plaintiff had a history of abusing "crack and meth."  After the consultation and reviewing Plaintiff's medical history, Dr. Subin concluded that Plaintiff "shows no significant objective finding," and that Plaintiff was capable of performing unskilled nondetailed tasks in a nonpublic setting.

E.   Vocational Expert Testimony

Jose Chaparro testified as a vocational expert ("VE") at the July 13, 2012 hearing before the presiding ALJ, who posed the following hypothetical:

> [L]et's assume a hypothetical individual the same age as Claimant, same educational background, same work history.  This individual is limited to a sedentary level of activity with no climbing, balancing, kneeling, crouching, or crawling.  She needs to avoid concentrated exposure to dust, fumes, and chemical odors, and is limited to simple and repetitive tasks.

In response, the VE testified that a similarly capable individual could not return to Plaintiff's past relevant work because Plaintiff prior work did not qualify, thus, she had "no past relevant work." Considering the demands of unskilled, sedentary work, the limitations of Plaintiff's residual functional capacity ("RFC"),[4] and the Plaintiff's entire medical-vocational profile, the VE testified that although a similarly capable individual would not be able to perform the demands of Plaintiff's previous work, such an individual "could do the world of sedentary unskilled work."  The VE and the ALJ had the following exchange about other unskilled, sedentary work available in the national economy that this hypothetical individual could perform:

> VE    I do have some examples.  First example is called "addresser." [ . . . ]  That is sedentary work, it's unskilled.  That DOT code is 209.587-010, and national numbers of jobs are approximately . . . about 12,400, [and] in California there are about 2,400. There is another job called microfilming document preparer, it's also sedentary and

---

[4] A claimant's "residual functional capacity" is what a claimant can still do despite her limitations. 20 C.F.R. § 404.1545(a).  Where those limitations are physical, the Commissioner "considers [the claimant's] ability to do various physical activities" walking, standing, lifting, carrying, pushing, pulling, reaching, handling and "evaluates other physical functions" to determine the claimant's "residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

also unskilled.  The DOT code is 249.587-018.  Nationally there are about 21,800 or so, California has about 2,400 jobs or so.  [. . .]  Let's see what else.  Telephone quotation clerk, also sedentary and unskilled, DOT code is 237.367-046.  There are about 5,300 [jobs] nationally, about 500 in California.

ALJ    Are these compatible with the DOT?

VE     They are.

## LEGAL STANDARD

An individual is considered disabled for purposes of disability benefits if she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).  The impairment(s) must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.[5]  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  In the first-step analysis, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C .F.R. §§ 404.1520(b), 416.920(b).  If not, in the second step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.*

---

[5] In the five-step sequential review process to determine whether a claimant qualifies as disabled, the burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five.  *See Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Id.* at 1098–99; 20 C.F.R. §§ 404.1520, 416.920.

§§ 404.1520(c), 416.920(c).  If so, in the third step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments, 20 C.F.R. 404, Subpart P, App. 1.  *Id*. §§ 404.1520(d), 416.920(d).  If not, in the fourth step, the ALJ must determine whether the claimant has sufficient RFC, despite the impairment or various limitations to perform his past work.  *Id*. §§ 404.1520(f), 416.920(f).  If not, in step five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id*. §§ 404.1520(g), 416.920(g).

## DISCUSSION

### I.    The ALJ's Determination

Based on the weight of the medical opinions, the ALJ concluded that the Plaintiff's subjective complaints were greater than the objective findings and not consistent with the objective medical evidence.  At the time of the ALJ decision, on August 17, 2012, Plaintiff was 36 years old, a younger individual according to the Medical-Vocational Guidelines (also known as "the grids"). 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(h)(1).  Plaintiff graduated from high school, received her CNA certificate, and was able to communicate in English.  Plaintiff worked previously as a certified nursing assistant, a semiskilled job.

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of May 26, 2010.  Her severe impairments were asthma, scoliosis, cervical disc bulge, cervical lordosis, and anxiety disorder.  None of these impairments alone or in any combination met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  The ALJ concluded that Plaintiff was capable of performing a range of sedentary work as defined in 20 C.F.R. § 404.967(a), limited to simple repetitive tasks.  In doing so, she considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective longitudinal medical evidence and other evidence.  The ALJ further concluded that,

despite Plaintiff's limitations, significant numbers of positions existed in the national economy

which she could perform.  Accordingly, Plaintiff was not disabled, as defined by the Act.

## II.    Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to

deny benefits under the Act.  The record as a whole must be considered, weighing both the evidence

that supports and the evidence that detracts from the Commissioner's decision.  *Lingenfelter v.*

*Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).  In

weighing the evidence and making findings, the Commissioner must apply the proper legal

standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  If an ALJ applied the

proper legal standards and the ALJ's findings are supported by substantial evidence, this Court must

uphold the ALJ's determination that the claimant is not disabled.  *See, e.g., Ukolov v. Barnhart*, 420

F.3d 1002, 104 (9th Cir. 2005); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "more than

a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998

(9th Cir. 2008).  It is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Burch*, 400 F.3d at 679.  Where the evidence as a whole can support either

outcome, the Court may not substitute its judgment for the ALJ's, rather, the ALJ's conclusion must

be upheld.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## III.    Sequential Analysis

The first step of the ALJ's sequential analysis is not at issue.  Both Plaintiff and the

Commissioner agree that Plaintiff was not currently performing substantial gainful work.  *See* 20

C.F.R. § 416.920(a)(4)(i).

At steps two and three, the ALJ found that Plaintiff's asthma, scoliosis, cervical disc bulge,

cervical lordosis, and anxiety disorder were severe impairments, but that none of these impairments

alone or in any combination met or medically equaled the severity of an impairment listed in 20

C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526,

416.920(d), 416.925, 416.926.  Plaintiff does not challenge the ALJ's step-two findings and conclusion.

As an intermediate step between steps three and four, the ALJ must assess the claimant's RFC.  *See* 20 C.F.R. § 416.920(e).  The ALJ stated Plaintiff's RFC in this way:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry 10 pounds occasionally, less than 10 pounds frequently, stand and/or walk for a total of two hours and sit for six hours in an eight-hour workday.  She must never climb, balance, kneel, crouch or crawl.  She must also avoid concentrated exposure to chemicals, dust and fumes.  She can perform simple repetitive tasks (20 CFR 404.1567(a) and 416.967(a)).

Plaintiff challenges the ALJ's construction of her RFC.

At step four, the ALJ must determine whether, in light of the claimant's RFC, she can return to substantial gainful activity performed in the past.  20 C.F.R. § 404.1520(e).  Here, the ALJ determined that Plaintiff was not capable of returning to her past relevant work because the ALJ found that she had no past relevant work.  Step four is not at issue.

At step five, the Commissioner must establish that the claimant is capable of performing substantial gainful work.  The ALJ presented the above RFC to the VE, who considered whether an individual burdened with the stated limitations could obtain other gainful work in the economy.  The VE testified that although Plaintiff had no prior relevant work to which she could return, she could perform work as a microfilm preparer (DOT 249.587-018), telephone quotation clerk (DOT 237.367-046), or addresser (DOT 209.587-010).  The VE further testified as to the availability of these jobs in the region and nationally.  Accordingly, the ALJ determined that Plaintiff is not disabled.  Plaintiff challenges the step-five findings and conclusion.

In sum, Plaintiff argues that the ALJ erred in (1) failing to fully account for Plaintiff's moderate limitations in social functioning in the final construction of the RFC; (2) failing to secure the VE's justification for deviating from the Dictionary of Occupations Titles ("DOT"); and, (3) determining that there is other work in the national economy that Plaintiff could perform.

### 1.  Residual Functional Capacity

Plaintiff first contends that the ALJ improperly assessed her RFC.  Plaintiff claims that despite the finding that Plaintiff has moderate difficulties in social functioning, the ALJ erred by omitting these difficulties from the RFC determination.  Plaintiff also contends that the ALJ should have included the moderate limitation in social functioning in the hypothetical to the VE.

A claimant's RFC is the most a claimant can still do despite his limitations. *Smolen v. Chater,* 80 F.3d 1273, 1291 (9th Cir. 1996) (citing 20 C.F.R. § 404 .1545(a)).  In assessing a claimant's RFC, the ALJ must consider all of the relevant evidence in the record. 20 C.F.R. § 404.1545(a)(2), (3).  The RFC assessment considers only functional limitations and restrictions that result from the claimant's medically determinable impairment or combination of impairments. SSR 96–8p.[6]  However, functional limitations in the broad categories of "social functioning," and "concentration, persistence, or pace," which are assessed as part of the psychiatric review technique, "are not an RFC assessment." SSR 96–8p.  Such limitations are used to rate the severity of mental impairment(s) at steps two and three of the sequential evaluation process. *Id.*  The RFC assessment, on the other hand, "requires a more detailed assessment by itemizing various functions contained in the broad categories," and is based on all of the relevant evidence, including "statements about what you can still do made by nonexamining physicians and psychologists." 20 C.F.R. § 416.913(c); *see also* Social Security Ruling 96–8p.

In crafting the RFC, the ALJ relied on the psychiatric review form wherein Dr. Izzi opined that Plaintiff had moderate difficulties in social functioning.  Dr. Izzi noted that Plaintiff's ability to get along with peers or be supervised in work-like settings would be moderately limited by her mood disorder.  Similarly, State Agency non-examining consultative physicians opined that Plaintiff

---

[6] "The Secretary issues Social Security Rulings to clarify the Secretary's regulations and policy .... Although SSRs are not published in the federal register and do not have the force of law, [the Ninth Circuit] nevertheless give[s] deference to the Secretary's interpretation of its regulations." *Bunnell v. Sullivan,* 947 F.2d 341, 346 n. 3 (9th Cir. 1991) (en banc) (internal quotations and citations omitted).

14

should work in a non-public setting.  Plaintiff argues that despite according "great weight" to Dr. Izzi's opinions, the ALJ failed to incorporate all of his assessed limitations into Plaintiff's RFC, thus, did not fully account for Plaintiff's acknowledged moderate difficulties with social functioning.  The Commissioner counters that the ALJ is not required to incorporate into the RFC the full panoply of the mental health assessment, and the Court agrees.

An ALJ is not required to incorporate a doctor's specific statements into the RFC or in the questions posed to the VE because moderate impairments assessed in broad functional areas used at steps two and three of the sequential process do "not equate to concrete work-related limitations for purposes of determining a claimant's RFC." *See Soto v. Colvin,* No. EDCV 12–1877–OP, 2013 U.S. Dist. LEXIS 85805, at *7, 2013 WL 3071263 (C.D. Cal. June 17, 2013) (citing *Rogers v. Comm'r of SSA,* 490 Fed. Appx. 15 (9th Cir. 2012)).  "[T]he term 'moderate' does not necessarily indicate a degree of limitation that must be expressly reflected in the RFC assessment [because it] does not inherently translate to a concrete functional limitation." *Brink v. Astrue,* 2013 WL 1785803, *5 (D.Or. Apr 24, 2013) (collecting cases).  The mild, moderate, or severe limitations in the broad categories of "activities of daily living" that are assessed as part of the psychiatric review technique, such as maintaining social functioning, "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96–8p, *available at* 1996 WL 374184; *see also Rogers,* 490 Fed.Appx. at 17–18 (moderate impairments assessed on a psychiatric review technique form "in broad functional areas used at steps two and three" did not equate to concrete work-related limitations for RFC; rather, "the RFC assessment adequately captures restrictions in broad functional areas if it is consistent with the concrete limitations in the medical opinions").

As a result, "the dispositive inquiry is whether the ALJ's RFC assessment is supported by substantial evidence." *Brink,* 2013 WL 1785803 at *5 (citing *Stubbs–Danielson,* 539 F.3d 1169, 1173–74 (9th Cir. 2008) ("an ALJ's assessment of a claimant adequately captures restrictions related

to [broad functional areas] where the assessment is consistent with restrictions identified in the medical testimony") (citations omitted)); *Bickford v. Astrue,* 2010 WL 4220531, *11 (D .Or. Oct. 19, 2010) ("so long as the ALJ's decision is supported by medical evidence, a limitation to simple, repetitive work can account for moderate difficulties in concentration, persistence or pace") (citations omitted).

Here, the ALJ did not err in failing to include Plaintiff's moderate limitations in social functioning in the RFC because the determination is supported by substantial evidence.  Specifically, the ALJ discussed Dr. Izzi's opinions regarding Plaintiff's moderate difficulties with social functioning in determining whether Plaintiff had a listed impairment, and noted that he did not consider them "marked" difficulties.  Moreover, the ALJ emphasized that Plaintiff had not endorsed having any social functioning limitations.  At every given opportunity, of which there were many, Plaintiff reported no such impairment.  Indeed, Plaintiff reported to Dr. Izzi feeling "pretty happy." She consistently reported on her adult function reports and appeal report that she had no problems dealing with family, friends, neighbors, authority figures, and others.  Plaintiff also reported attending religious services, seeing her friends on a regular basis, extended family occasionally, and participating and socializing with her immediate family daily.  Furthermore, her husband made a similar assessment in his third party function report.

Where, as here, Plaintiff does not complain of certain impairments, her reports may function as specific and legitimate evidentiary justification for the ALJ's discounting a doctor's opinion.  *See Fisher v. Schweiker*, 568 F.Supp. 900, 903 (N.D. Cal. 1983) (finding it permissible to rely on Plaintiff's testimony regarding her impairments in discrediting a treating physician's opinion). Similarly, a plaintiff's report of daily activities has also been used as a basis for discounting a treating physician's opinion. *See Nguyen v. Commissioner of Social Security*, 2008 WL 859425, *8 (E.D. Cal. 2008).  Because Plaintiff made such reports, therefore, the ALJ could reasonably justify discounting a specific opinion of Dr. Izzi, who was merely an examining and not a treating

16

physician.  The ALJ is charged with making such credibility determinations, and did so here on the

basis that Plaintiff's function and daily activity reports were consistent with Dr. Izzi's conclusion

that Plaintiff was capable of responding to usual work session situations, dealing with changes in a

routine work setting, and did not have a mental impairment that imposed significant work-related

limitations.[7]

Like the ALJ, the Court likewise finds substantial support in the record that confirms the

doctors' consensus that Plaintiff is capable of unskilled work.  Unskilled work is that which requires

little or no judgment to do simple duties that can be learned on the job in a short period of time and

needs little specific vocational preparation. *See* 20 C.F.R. § 416.968(a); *see also* SSR 83-10.  The

basic mental demands of unskilled work include the ability to understand, carry out, and remember

simple instructions.  SSR 85-15.  By limiting Plaintiff to "simple repetitive tasks," the RFC

adequately captures the mental health professionals' opinions that Plaintiff has moderate impairment

in social functioning.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.00(g) ("[T]he primary work

functions in the bulk of unskilled work relate to working with things (rather than with data or

people)."); *see, e.g., Rogers v. Comm'r of Soc. Sec.,* 2011 U.S. Dist. LEXIS 13741, at *36–37, 2011

WL 445047 (E.D.Cal. Jan. 25, 2011) (collecting cases) (finding that generally, "unskilled work

accommodates a need for limited contact with the general public.").

Plaintiff further argues that the ALJ improperly relied on the VE's testimony based on an

incomplete hypothetical.  However, because the ALJ's questions posed to the VE mirrored all of the

limitations and restrictions found in the ultimate RFC – including the limitation to simple repetitive

tasks – the hypothetical was complete.  *Embry v. Bowen,* 849 F.2d 418, 422 (9th Cir. 1988)

(requiring that the hypothetical contain all the limitations and restrictions of the claimant; otherwise,

---

[7] This principle also applies to the non-treating State Agency physicians, who were merely
consultative.  While the ALJ acknowledged the State Agency medical consultants' opinion that
Plaintiff was "moderately limited in her ability to . . . interact appropriately with the general public,"
the ALJ's nondisability determination was consistent with the physicians' ultimate assessment that
Plaintiff could perform unskilled work.

the vocational expert's testimony is without meaning); *Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th Cir. 2001) (finding that hypothetical questions to the vocational expert should be "accurate, detailed, and supported by the medical record.") (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). Therefore, the VE's testimony constitutes substantial evidence on which the ALJ may rely. *Embrey,*849 F.2d at 422; *see also Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001).

The Court concludes that the ALJ's RFC construction is supported by substantial evidence. Where, as here, the evidence reasonably supports the ALJ's decision, the Court may not disturb it. *See Stubbs-Danielson*, 539 F.3d at 1174 (citing *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1195–96 (9th Cir. 2004)). The Court finds no legal error and that substantial evidence supports the ALJ's determination at this intermediate step.

### 2. Step-Five Analysis: Deviation from the DOT

Plaintiff next alleges that the ALJ's step-five finding was erroneous because it was based on VE testimony that conflicted with the DOT and that the ALJ did not obtain a reasonable explanation from the VE for the deviation. The Commissioner contends that the ALJ did not err in the step-five conclusion because her findings were consistent with the objective evidence of record and are supported by substantial evidence. In any event, the Commissioner replies that the harmless error rule applies. For the reasons below, the Court finds that substantial evidence supports the ALJ's findings and conclusion and that harmless error principles apply.

At step five of the sequential analysis, the ALJ relied on the VE's testimony to conclude that Plaintiff was capable of performing unskilled work. Plaintiff asserts that the ALJ's step-five finding was erroneous because the DOT indicates that Level 3 reasoning skills are required to perform "microfilm preparer" or "telephone quotation clerk" jobs, and she claims that her RFC limitations for simple repetitive tasks precludes such activity. Plaintiff further contends that because the ALJ did not obtain a reasonable explanation for the discrepancy from the VE, her step-five finding lacks the support of substantial evidence.

The Commissioner argues that the ALJ did not err at step five because the VE testimony did not deviate from the DOT and is supported by the record as a whole.  Nevertheless, the Commissioner argues that an error, if any, was harmless because the ultimate conclusion was correct and supported by substantial evidence.  The Commissioner contends that Plaintiff's age, education and previous work experience direct a finding of not disabled under the grids and, notwithstanding Plaintiff's limitations, the VE identified an alternative job that Plaintiff could perform.

The record reflects that at step five, the ALJ relied on the VE's testimony that the "microfilm preparer" or "telephone quotation clerk" has an SVP of 2 and that a person limited to simple repetitive tasks could work in those positions because they are considered "unskilled." *See* SSR 00-4p ("[U]nskilled work corresponds to an SVP of 1-2").  Both positions are considered SVP Level 2, however, they are also classified by the DOT as Reasoning Level 3.  *See* DOT Nos. 249.587-018, 237.367-046.  Therefore, the ALJ must develop the record to demonstrate whether an individual with Plaintiff's limitations to simple, repetitive tasks could perform a position requiring level 3 reasoning under the DOT.

Yet, even if the Court were to find that a restriction to simple, repetitive tasks is not fully consistent with the ability to perform unskilled work with a reasoning level of 3, the record may still contain substantial evidence that Plaintiff retains the ability to perform *other* unskilled work which "exists in significant numbers in the national economy." 20 C.F.R. § 416.960(c).  Thus, because applying the harmless error doctrine in that context may moot further review, the Court first turns to the third job: "addresser." *See, e.g., Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) ("[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion.'"), (quoting *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004)).  "The burden is on the party claiming error to demonstrate not only the error, but also that it affected his 'substantial rights,' which is to say, not merely his procedural rights." *Ludwig v. Astrue*, 681 F.3d 1047, 1054 (9th Cir. 2012).  A reviewing

court must consider "an estimation of the likelihood that the result would have been different." *Id.* at 1055 (finding that "[t]he ALJ's decision, and the record of [claimant's] contradictions, make it plain that the ALJ would have reached the same conclusion" as to disability if the ALJ had not erroneously considered *ex parte* evidence).

### 3. Step-Five Analysis: Unskilled Jobs in the Economy at "Significant Numbers"

Assuming, *arguendo*, that the ALJ improperly concluded that Plaintiff could perform the two reasoning level 3 jobs, any alleged error in the ALJ's step-five findings and conclusion was harmless because substantial evidence supports the proposition that Plaintiff can perform at least one other job at reasoning level 2 which is available in significant numbers.  20 C.F.R. § 416.905(a); *see also Stout v. Commissioner, Social Sec. Admin.,* 454 F.3d 1050, 1054–55 (9th Cir.2006) (harmless error applies in the Social Security context where mistake is inconsequential to the ultimate nondisability determination).  To make this determination, an ALJ may rely on the grids – a matrix that takes into consideration a claimant's RFC, age, work experience and education.  *Hoopai v. Astrue*, 499 F.3d 1071, 1075 (9th Cir. 2007).  "When the grids match the claimant's qualifications, 'the guidelines direct the conclusion as to whether work exists that the claimant could perform.'"  *Id.* (quoting *Heckler v. Campbell*, 461 U.S. 458, 462 (1983).  For the grids to apply, Plaintiff must have the ability to perform unskilled work. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b).

The ALJ proceeded to a full step-five analysis, wherein the grids directed the conclusion that Plaintiff was not disabled because Plaintiff could perform a range of sedentary work, limited to simple, repetitive tasks.  20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 201.21 & 201.22.  Plaintiff does not challenge the ALJ's conclusion that Plaintiff has the RFC to perform simple, repetitive tasks, such as

those required by the "addresser" job, as defined by the DOT.[8]  Rather, Plaintiff challenges the ALJ's conclusion that a "significant number" of those jobs exist in the national economy.

In her step-five analysis, the ALJ determined that a significant number of jobs existed that could be performed by an individual with Plaintiff's limitations.  In support of her findings and conclusion, the ALJ relied on the VE's testimony.  The VE testified that at least one unskilled SVP 2 job – "addresser" – is classified as Reasoning Level 2 and that an individual with Plaintiff's limitations to simple, repetitive tasks could perform such work as it is generally performed.  At the hearing, the VE identified that approximately 2,400 "addresser" jobs were available in California and 12,400 nationally.  Although there are no bright line rules as to what constitutes a "significant number," the Ninth Circuit has recently held that either 2,500 jobs in the State of California or 25,000 jobs nationally satisfies the standard. *See Gutierrez v. Colvin*, 740 F.3d 519, 527-29 (9th Cir. 2014).  Thus, because of the structure of the Ninth Circuit's compound sentence, only one of *either* the California *or* the national number need satisfy the standard.  Notwithstanding the disparate national numbers, the Court finds 2,400 jobs in California (at 100 less than 2,500, a negligible 4% difference), to be substantially similar enough to the *Gutierrez* standard to likewise be considered a "significant number."  Accordingly, the Court finds that the VE's testimony serves as substantial evidence supporting the ALJ's conclusion that Plaintiff could perform other work that existed in substantial numbers in the national economy.

---

[8] The Ninth Circuit has not directly addressed the issue although many district courts, including this one, have found that the grids are applicable at step five because a person restricted to simple, repetitive tasks can perform unskilled work. *See e.g. Beaupre v. Astrue*, 2012 WL 1435032 (E.D. Cal. Apr. 25, 2012) at *11-12 (concluding that claimant's restriction to simple repetitive tasks and entry level work "was not sufficiently severe to warrant departure from the grids"); *Ramsey v. Astrue*, 2012 WL 5499900 (E.D. Cal. Nov. 13, 2012) at *6 (affirming the ALJ's reliance on the grids because the claimant's RFC for simple repetitive tasks that do not involve more than occasional interaction with the public was "consistent with unskilled work"); *Sam v. Astrue*, 2010 WL 496718 (E.D. Cal. Dec. 1, 2010) at *11 (affirming the ALJ's reliance on the grids where Plaintiff was limited to simple, repetitive tasks because "[t]he ability to perform simple, repetitive tasks is consistent with unskilled work"); *Tapia v. Colvin*, 2014 WL 4655829 (C.D. Cal. Feb. 4, 2014) at *4 (collecting cases).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.     CONCLUSION AND ORDER**

At bottom, both the grids and VE testimony substantively support the ALJ's nondisability determination.  *Molina*, 674 F.3d at 1115.  The Court's own review of the record failed to reveal any evidence that the ALJ improperly disregarded.  Even assuming, *arguendo*, that the ALJ erroneously found Plaintiff capable of performing unskilled Reasoning Level 3 work, any such error was inconsequential to the ultimate determination because substantial evidence supports the ALJ's conclusion that, notwithstanding her limitations, Plaintiff could perform other unskilled work that exists in significant numbers in the economy.

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled.  On that basis, the Court affirms the ALJ's nondisability determination.  Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security (Doc. 1) is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court **SHALL** enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff.


IT IS SO ORDERED.

Dated:   __October 1, 2014__                    _____ **/s/ Sandra M. Snyder**
                                                UNITED STATES MAGISTRATE JUDGE

22